Richard F. LOOMIS, Jr., Appellant,

v.

**BLACKLANDS PRODUCTION CREDIT ASSOCIATION, Appellee.**

No. 5934.

Court of Civil Appeals of Texas, Waco.

March 29, 1979.

Rehearing Denied April 19, 1979.

William Andress, Jr., William Andress & Associates, P. C., Dallas, L. L. Geren, Bradley & Geren, Groesbeck, for appellant.

Joe Cannon, Cannon, Cannon & Reed, Groesbeck, for appellee.

HALL, Justice.

Plaintiff-Appellee Blacklands Production Credit Association brought this suit against defendant-appellant Richard F. Loomis, Jr., to recover the balance allegedly due to plaintiff on a promissory note in the original principal amount of $550,000.00, executed by defendant and payable to plaintiff, and to recover attorneys' fees provided for in the note. Defendant answered that plaintiff had charged usurious interest on the note, and pleaded for recovery against plaintiff of the penalties set forth in our usury statutes. Defendant also filed a counterclaim alleging in detail that he was entitled to an offset of at least the amount $500,000.00, based upon the Trustee's sale of certain realty located in Dallas County under a deed of trust executed by defendant to plaintiff to secure the note. Prior to the trial, defendant's counterclaim for the offset was struck upon exceptions by plaintiff setting up that a suit by defendant to set aside the Trustee's sale was then pending in Dallas County. Defendant then dismissed the Dallas County suit, but the court persisted in its ruling striking the counterclaim.

The trial began with a jury. After the parties had rested their proof they moved the court to discharge the jury, asserting there were no fact questions for decision. The motion was granted, and the jury was discharged. Eventually, judgment was rendered awarding plaintiff a recovery of $530,514.97, representing principal and interest due on the note, plus $71,000.00 for attorneys' fees. The award of attorneys' fees was based upon a provision in the note in which the maker agreed "to pay Fifteen (15%) per cent additional upon the principal and interest then unpaid as attorney's fees or cost of collection" if the note "was placed in the hands of an attorney for collection or collected through court proceedings."

Defendant appealed. We reverse the judgment.

Defendant's main contentions on appeal are that the court erred (1) in rejecting his plea of usury and (2) in striking his counterclaim for the offset.

Defendant is a lawyer and a rancher. The note in question was in the principal sum $550,000.00, and represented a loan to defendant to be used by him in his ranching operations. The note was dated February 14, 1974, and was payable on or before February 15, 1975. It provided that a variable rate of interest would be charged on funds to be advanced to defendant under the loan; that the first advance would bear interest from its date until paid at the rate of 9.36 per cent per annum; and that each advance thereafter would bear interest from its date until paid "at the established rate of interest being charged by payee on new loans at the time of each such advance, but in no event shall any such interest rate be in excess of the maximum permitted under the laws of Texas."

Production Credit Associations are federally chartered institutions functioning under the terms and regulations of the Farm Credit Act of 1971, 85 Stat. 583, 12 U.S.C.A. §§ 2001 et seq. Section 2.13 of the Act (12 U.S.C.A. § 2094) contains these pertinent provisions:

(a) A production credit association may issue voting stock, nonvoting stock, preferred stock, participation certificates, and provide for an equity reserve. Holders of stock, participation certificates, and equity reserve shall have such rights, not inconsistent with the provisions of this section, as are set forth in the bylaws of the association. Stock shall be divided into shares of $5 par value each, and participation certificates shall have a face value of $5 each.

. . . . .

(f) Each borrower from the association shall be required to own at the time the loan is made voting stock or participation certificates as provided in the bylaws of the association, in an amount equal in fair book value (not exceeding par or face amount, as the case may be), as determined by the association, to $5 per $100

or fraction thereof of the amount of the loan. . . .

.    .    .    .    .

(h) As a further means of providing capital, an association may . . . require borrowers to purchase stock or participation certificates in addition to that required in subsection (f) hereof . . . in an aggregate amount not exceeding $5 per $100 or fraction thereof of the amount of the loan. . . .

.    .    .    .    .

(k) In any case where the debt of a borrower is in default, the association may retire all or part of the capital investments in the association held by such debtor at the fair book value thereof, not exceeding par or face amount, as the case may be, in total or partial liquidation of the debt.

Under those provisions of the Farm Credit Act, plaintiff has issued shares of voting stock denominated by it "Class B Stock," of $5.00 par value each, and requires borrowers to own shares of that stock in an amount equal to $10.00 per $100.00 or fraction thereof of the full amount of his loan balance. If it develops during the course of a loan that the borrower owns more than the required amount of Class B Stock, he may use it for further advances, or sell it to another borrower, or seek credit for it against his loan balance. Upon the borrower's request, the stock certificates are delivered to him. Without such request, certificates are not delivered, but the stock transfer to the borrower is reflected in plaintiff's books. The borrower may borrow from plaintiff funds needed for the stock purchase in addition to his advances for farm or ranching operations, or he may purchase the stock with funds from a source other than plaintiff. All that is required is that he own Class B Stock equal in value at $5.00 per share to 10% of the total amount of his loan. Class B Stock may not be sold publicly and it does not pay dividends. However, only owners of that stock are eligible to be elected to plaintiff's Board of Directors or to vote for the Directors, and for that reason many owners retain the stock after their loans are paid.

The record shows without contradiction that defendant borrowed from plaintiff all the money used by him for the purchase of his required Class B Stock. Simply stated, for every $100.00 advanced to plaintiff which was used by him for his ranching enterprise, defendant was issued two shares of Class B Stock on plaintiff's books valued at $5.00 per share; the total loan advance charged to defendant by plaintiff was $110.00; and the interest rate applicable at the time of the advance was charged against the $110.00 total advance.

The evidence shows that defendant was familiar with the stock requirement when he made the loan; and that he "knew when [he] borrowed sixty thousand [he] would also be borrowing six thousand additional unless [he] purchased six thousand dollars worth of stock" with money from another source. It shows that during the one-year term of the loan he was advanced funds for the purchase of 9190 shares of stock at $5.00 per share, and that after he became delinquent plaintiff redeemed the stock at its par value and credited the principal of defendant's note with $45,950.00 for the stock.

The maximum interest rate charged on all advances to defendant (for both stock and for ranching purposes) was 9.96 per cent per annum; and the minimum rate charged was 9.36 per cent.

The term "interest" is defined in our usury statutes as "the compensation allowed by law for the use or forebearance or detention of money." Article 5069–1.01, Vernon's Tex.Civ.St. With exceptions not applicable here, a greater rate of interest than ten per cent per annum "shall be deemed usurious." Article 5069–1.02. Penalties ranging from forfeiture of interest and payment of attorneys' fees against one who contracts for, charges or receives interest in excess of the legal amount, to forfeiture of "all principal . . . and all other charges" with payment of attorneys' fees when the interest is in excess of double the legal amount, are prescribed in Article 5069–1.06.

■ In cash loan transactions from which the lender deducts interest, fees, commis-

sions or other front-end charges, the actual amount of money of which the borrower has use, detention or forbearance is held to be the true principal of the loan in testing for usury. *Tanner Development Co. v. Ferguson,* 561 S.W.2d 777, 787 (Tex.1977); *First State Bank of Bedford v. Miller,* 563 S.W.2d 572, 575 (Tex.1978). The *Miller* case is an example of the application of the rule, where the borrowers obtained a loan of $70,000.00, but they were required to leave $14,000.00 in a noninterest bearing account without use of it for any purpose other than satisfaction of postdated interest checks; and it was held that the true principal of the loan was $56,000.00 in deciding the question of usury.

In our case, the advances received by defendant from plaintiff totaled $508,-932.73. Of that sum, $462,982.73 was used by defendant for purchasing livestock and ranch supplies, and the remaining $45,-950.00 was used by him for the purchase of Class B Stock.

■ Defendant's claim of usury is based upon his assumption that under the rule in the *Tanner* and *Miller* cases, supra, the required purchase of the Class B Stock was a "front-end charge" which resulted in usurious interest on his loan. Using the interest rate of 9.36% per annum (the lowest charged by plaintiff) he reasons as follows in his brief: "Defendant's drafts [for livestock and supplies] were honored for $462,-982.73, for which he was obligated to repay $508,932.73, including his Class B Stock, plus interest at 9.36% per annum or $47,-636.10 for the year term of the note. This makes a total repayment of $556,568.83 for a year's use of $462,982.73, or $93,586.10 interest, which is an effective interest rate of 20.21%."

It is our view that the advance of funds to defendant for Class B Stock purchase was not a "front-end charge." Defendant was not required to borrow funds from plaintiff for purchase of the stock. Ownership of the stock by defendant as a borrower from plaintiff was required and authorized by federal statute; and it qualified defendant to borrow money from plaintiff, a

right not held by non-owners of the stock. The stock had an actual value of $5.00 which was eventually returned to defendant. And, finally, ownership of the stock vested in defendant the right of participating directly in the selection of plaintiff's Board of Directors and the right to seek election to that body. Defendant received valuable use of the money invested in the stock.

Defendant's usury claim was properly rejected by the trial court under the record before us.

In July, 1975, after the note in question had matured, defendant executed a deed of trust to plaintiff on certain improved realty located in the City of Dallas to secure the note. On March 1, 1977, at an extra-judicial sale by the Trustee in Dallas County, plaintiff bought the property for $13,500.00. Plaintiff then credited the principal of the note with that amount. Thereafter, defendant filed suit in the 101st District Court of Dallas County to set aside the sale of the property, alleging irregularities in the holding of the sale and asserting the property's true value was $550,000.00.

The case at bar was brought by plaintiff in Limestone County. Plaintiff's original petition was filed in August, 1976; and its first amended original petition, upon which it went to trial, was filed on May 13, 1977. On June 6, 1977, defendant filed a plea in abatement in this case, alleging the pending suit in Dallas County to set aside the Trustee's sale and asserting that his "rights, credits, and offsets in [the instant] proceeding cannot be ascertained and finally adjudicated" until the Dallas County suit was resolved.

On October 26, 1977, expressly "subject to said plea in abatement and without waiving same, but still insisting upon said plea in abatement in all things," defendant filed his fourth amended answer and his counterclaim in the case at bar. In those pleadings, he alleged his defense of usury, and also pleaded in great detail that the Trustee's sale was irregular; that the market value of the property sold under the Trustee's deed to plaintiff for $13,500.00 was at

least $500,000.00; and that accordingly he was entitled to an offset of $500,000.00 on the note.

On October 28, 1977, plaintiff filed special exceptions to defendant's counterclaim for the asserted $500,000.00 offset, on the ground that the basis of the alleged offset, irregularity of the Trustee's sale, was the basis of a pending lawsuit in Dallas County to set aside the sale.

Plaintiff's special exceptions were heard by the court on Monday, November 7, 1977, which was the day before the trial in the instant case began. The exceptions were sustained, and defendant's counterclaim for the offset was stricken. Later that day (November 7th), through co-counsel in Dallas, defendant took a nonsuit without prejudice of his lawsuit in Dallas County. He then orally moved the court in the instant case, in the light of the nonsuit, to overrule plaintiff's special exceptions and permit him to proceed to trial on his action for the offset. The motion was overruled, and the case proceeded to trial the next day. Before the jury was discharged, defendant perfected a bill of exception on his counterclaim for the alleged offset and tendered the proof made on the bill into the evidence of the case. The proof supported an offset of $600,000.00. The tender was denied by the court.

Defendant contends that after he had dismissed the Dallas County suit his action for the offset growing out of the Trustee's sale was a compulsory counterclaim within the terms of Rule 97, Vernon's Tex.Rules Civ.Proc., and argues that the court therefore erred in sustaining plaintiff's special exceptions and refusing to let him prove the offset. Plaintiff says the claim was not a compulsory counterclaim under the rule. Both cite cases in support of their theories.

■ Claims which are "the subject of a pending action" are expressly excluded from the term "compulsory counterclaim" in Rule 97. It is clear therefore that when plaintiff's special exceptions were initially sustained by the court defendant's claim for the offset did not fall within the term. It is our view that whether the claim was a compulsory counterclaim after defendant dismissed the Dallas County suit is not a justiciable issue inasmuch as defendant had pleaded it and reasserted it, and we do not decide that question. However, we agree with defendant that the counterclaim was then properly before the court and was erroneously dismissed upon plaintiff's exceptions. To the extent that defendant would have succeeded on his counterclaim he would have been entitled to reduce plaintiff's recovery on the note, and, concomitantly, to reduce plaintiff's recovery of attorneys' fees. It follows that defendant was prejudiced by the court's ruling, and that the judgment must be reversed.

We need not discuss defendant's remaining complaints.

The judgment is reversed, and this cause is remanded for trial.